# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 6, 2010

Charles R. Fulbruge III
Clerk

No. 08-30236

FRANKS INVESTMENT COMPANY LLC

Plaintiff - Appellant

v.

UNION PACIFIC RAILROAD CO.

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before JONES, Chief Judge, and KING, JOLLY, DAVIS, SMITH, BARKSDALE, GARZA, BENAVIDES, STEWART, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, and HAYNES, Circuit Judges.[1]

Leslie H. Southwick, Circuit Judge.

The question before the *en banc* court is whether the preemption provision of a federal statute preempts a state law possessory action filed by a landowner to preserve a long-existing crossing over railroad tracks. We conclude that this landowner's state law action, removed to federal court based on diversity of citizenship, is not preempted. Consequently, we REVERSE the district court and REMAND for adjudication of the merits of the state law claims.

---

[1] Judges WIENER and DENNIS did not participate in this decision.

## I. BACKGROUND

Franks Investment Company owns a large tract of land in Louisiana. It leases portions of that land for farming. One boundary of the Franks land is parallel to Louisiana Highway 1 for about two miles. The tracks of the Union Pacific Railroad are laid on a 100-foot-wide strip of land it owns between the Franks property and Highway 1. The Union Pacific operates freight service on this line between Shreveport and Alexandria.

For decades, four private railroad crossings provided access to the Franks property from Highway 1. Wooden planks were laid between the rails, while the approaches consisted of dirt and gravel. In 2005, the Union Pacific posted notices of intent to close two of the four crossings that accessed Franks's property. Franks and the railroad entered negotiations, but there was no satisfactory resolution.

In December 2007, the Union Pacific closed and removed two of the crossings. It then threatened to remove the other two. In January 2008, Franks filed suit in state court under Louisiana Code of Civil Procedure Article 3655, claiming that it possessed a real right to use the four crossings. Franks sought an injunction to prevent the Union Pacific from closing the two remaining crossings and to compel it to replace the two crossings it removed.

The Union Pacific removed the case to federal court, as there was diversity of citizenship. Following a two-day bench trial, the district court ruled in favor of the railroad. The court found that Franks's state law action was preempted by a federal statute that we will discuss. A unanimous panel of this court affirmed, agreeing that Franks's possessory action was expressly preempted. *Franks Inv. Co., LLC v. Union Pac. R.R. Co.*, 534 F.3d 443 (5th Cir. 2008). Franks's petition for rehearing *en banc* was granted, causing the panel opinion to be withdrawn. *Franks Inv. Co., LLC v. Union Pac. R.R. Co.*, 562 F.3d 710 (5th Cir. 2009). We now address the preemption issues anew.

2

## II. DISCUSSION

The statutory provisions at the center of this dispute are in the Interstate Commerce Commission Termination Act ("ICCTA"). Pub. L. 104-88, 109 Stat. 803. In one of its sections, the jurisdiction of the Surface Transportation Board ("STB") is defined and the preemptive effect of the statute is declared.

The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

We will explore this language at length. First, we review some basics.

The preemptive effect of a federal statute is a question of law that we review *de novo*. *Friberg v. Kan. City Southern Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001).

In determining the existence and reach of preemption, Congress's purpose is "the ultimate touchstone" to use. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963)). Congress can show its purpose in one of two ways. First, it may "indicate preemptive intent through a statute's express language." *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008). However, even when there is an express preemption clause in a statute, "the question of the substance and scope of

Congress' displacement of state law still remains." *Id.* Second, Congress may impliedly preempt state law "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Id.*; *see Friberg*, 267 F.3d at 442.

There is also a presumption that the "historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Group*, 129 S. Ct. at 543 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The presumption is relevant even when there is an express pre-emption clause. That is because "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Id.* (quoting *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005)). Thus, the presumption operates both to prevent and to limit preemption.

This court has explained that the presumption against preemption is applicable to "areas of law traditionally reserved to the states, like police powers and property law. . . ." *Davis v. Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc). More recently and topically, we discussed the presumption against preemption in another railroad crossing case. *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321 (5th Cir. 2008). We found the no-preemption presumption to apply "with full force to this generally applicable state property law, even if applied to permit a private, at-grade railroad crossing." *Id.* at 334.

However, the specific preemption issue in *Barrois* was different. We considered whether there was "complete preemption" under the ICCTA. Under that doctrine, a state law claim will be transformed into one that arises under federal law when a federal statute commands the entire legal arena and in effect displaces any competing state law. *Id* at 331. Such preemption actually creates federal jurisdiction by its domination of the arena. *Id.* We found no complete

preemption. *Id.* at 338. Today we address the more common, indeed, the ordinary category of preemption.

We conclude, though, that the presumption need not be invoked in this case. Even without analyzing how that presumption might limit the preemptive effect of this enactment, we decide that preemption does not apply.

Today's dispute was created by the physical intersection of railroad operations and an owner's access to its land. Consequently, the law to be applied, absent preemption, is that which Louisiana applies to real property disputes.

## A.    *Express Preemption*

Because the relevant statute contains a preemption clause, statutory construction analysis begins with "the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

The parties disagree over the meaning of the text. The entire relevant section of the statute is only two, though lengthy, sentences. A structural issue is the relationship between the two sentences. The Union Pacific argues, first, that what controls is the section's first sentence, namely, that jurisdiction of the STB over "transportation by rail carriers" is exclusive. Next, the power of the word "exclusive" leads to federal preemption of all state court proceedings affecting rail transportation. In the railroad's view, because the present dispute concerns either transportation by rail carriers under Section 10501(b)(1) or rail facilities under Section 10501(b)(2), the STB is the only venue.

Conversely, Franks insists that we should focus on the second sentence of Section 10501(b)(2), as it contains the preemption clause. That sentence states that "the remedies provided under this part with respect to regulation of rail transportation are exclusive," a clause that contains several words important to our interpretation. The sentence closes by saying that the provided remedies

"preempt the remedies provided under Federal or State law." To Franks, use of the word "regulation" indicates that only laws that specifically regulate railroad transportation are preempted, while generally applicable laws that merely impact railroad transportation are not preempted.

As we seek to understand these words, we need to understand their context. The Act's title reveals that at least one of its effects was to terminate the Interstate Commerce Commission. The jurisdiction of the STB over what used to be regulated by the ICC needed to be defined. We focus today on Section 10501(b). The entirety of Section 10501 – too long to quote unless necessary, and it is not – provides that the STB has jurisdiction over transportation by rail carriers, which includes transportation only by rail, and also that which occurs by rail and water in some situations. 49 U.S.C. § 10501(a)(1). The next subsection provides that the transportation subject to STB's jurisdiction has certain geographical requirements, such as occurring between a place in one state and a place in a territory of the United States, or between two different places in the same state so long as the transportation is part of an interstate rail network. *Id*. §§ 10501(a)(2) (A) & (B). It is following these statements of jurisdictional conditions that Congress dropped in the language of Section 10501(b), that the jurisdiction is exclusive and the remedies are preemptive. Other limitations then follow, such as the STB's authority in quite narrow situations over local rail transportation. *Id*. § 10501(c)(3)(B).

The remedies available at the STB dealing with "rates, classifications, rules, . . . practices, routes, services, and facilities of such carriers," are exclusive. Some of those remedies are set out in Section 10701, which establishes standards for rates. Other provisions of the ICCTA deal with general requirements for rail operations. Obviously, many of the subjects listed in the exclusive jurisdiction section are significant ones dealing with the basics of the functions of railroads, *e.g.*, rates and routes.

We view the Union Pacific's arguments using the light given by this context. For the first time before the *en banc* court, it argues that tracks are railroad facilities under Section 10501(b)(2). Today is too late; this argument is waived. *See United States v. Brace*, 145 F.3d 247, 250 (5th Cir. 1998) (en banc).

Next, it is argued that railroad crossings fit within the definition of "transportation" under Section 10501(b)(1). The district court found the relevant part of the ICCTA's definition of "transportation" to be this: "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use." 49 U.S.C. § 10102(9)(A). After quoting this definition, the district court cited an opinion from the Northern District of New York, that had found that any physical improvement made to railroad tracks necessarily impacts the movement of passengers or property. *See Island Park, LLC v. CSX Transp., Inc.*, No. 1:06-CV-310, 2007 WL 1851784 (N.D.N.Y. June 26, 2007), *rev'd*, 559 F.3d 96 (2d Cir. 2009). As a result, all railroad crossings disputes fall within the definition of transportation.

We have the luxury not provided to the district court of knowing that the precedent on which it relied, and particularly the expansive definition of "transportation," was rejected on appeal. *See Island Park*, 559 F.3d at 102. The Second Circuit held, in reversing the district court's opinion that was relied on here, that a state court action involving whether a private railroad crossing used to transport farm equipment should be closed was not preempted. *Id.* at 99, 103. The court noted:

> In our view, the term rail "transportation" does not encompass the closure of this private rail crossing. Rail transportation does include "property . . . related to the movement of passengers or property . . . by rail," 49 U.S.C. § 10102(9)(A), and a rail crossing does constitute "an improvement to railroad tracks that allows

vehicles, equipment, and persons to traverse the tracks." 2007 WL 1851784, at *12. But we cannot conclude that *all* state action related to a railroad crossing is pre-empted. The appropriate questions are: what does the state seek to regulate and does the proposed regulation burden rail transportation?

*Id.* at 103 (footnote omitted). The court went on to conclude that closing a crossing does not relate to movement of passengers or property.

The Union Pacific distinguishes *Island Park* on the basis that it involved a state administrative order requiring a railroad to close a crossing for safety reasons. Franks is a private landowner using a state law to keep a railroad crossing open. This distinction is unimportant. Both cases involve state laws that affect railroad crossings. It does not matter whether the impetus behind an attempt to close a crossing comes from the state or the railroad owner. In either case, preventing the railroad owner from making its own decisions regarding railroad crossings creates the same amount of potential interference with railroad operational decisions.

We conclude that the relevant part of Section 10501(b) is its second sentence. The first, and longer one, is defining the authority of the STB in dealing with the fundamental aspects of railroad regulation, and barring others from interfering with those decisions by making the jurisdiction exclusive. We will return to that part of the statute later, but not until after we review the source of the preemption – the second sentence of the section.

We break the second sentence down into its component parts. What is declared to be exclusive are "the remedies provided under this part," which we have to some extent already discussed. There are proceedings before the STB that can be held on such matters as rates, rules, practices, and routes. Complaints about such matters can be brought to the STB. Remedies through administrative action are the exclusive ones.

Those remedies are exclusive "with respect to regulation," that last word being the one fought over in this case and in the precedents. The Eleventh Circuit has held that "Congress narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'manag[ing]' or 'govern[ing]' rail transportation, . . . while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001).[2] We find this interpretation of the ICCTA to be persuasive. The text of Section 10501(b), with its emphasis on the word regulation, establishes that only laws that have the effect of managing or governing rail transportation will be expressly preempted.

Finally, the remedies that are preempted are those "provided under Federal or State law," but those remedies receive their meaning from the earlier part of the sentence. To the extent remedies are provided under laws *that have the effect of regulating rail transportation*, they are preempted.

This analysis is consistent with the STB's explanation of preemption under the ICCTA. Our *Barrois* opinion reviewed the STB's interpretation, and found that it distinguished between two types of state actions:

> First, there are those state actions that are "categorically preempted" by the ICCTA because such actions "would directly conflict with exclusive federal regulation of railroads." Regulations falling within this first category are "facially preempted" or "categorically preempted" and come in two types:
>
>> The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a

---

[2] A number of other circuits have explicitly adopted this position as well. *See, e.g.*, *PCS Phosphate Co. v. Norfolk Southern Corp.*, 559 F.3d 212, 218 (4th Cir. 2009); *Adrian & Blissfield R.R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 539 (6th Cir. 2008); *N.Y. Susquehanna & Western Ry. Corp. v. Jackson*, 500 F.3d 238, 252, 254 (3d Cir. 2007) (noting also that "[i]n particular, we agree that a state law that affects rail carriage survives preemption if it does not discriminate against rail carriage and does not unreasonably burden rail carriage").

> railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized . . . .
>
> Second, there can be no state or local regulation of matters directly regulated by the Board – such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service.

*Barrois*, 533 F. 3d at 332 (citations omitted). Such regulation would by its very nature be "unreasonable interference with interstate commerce" and must be preempted. *Id.* We went on to discuss a second category of state actions that the STB found to be "preempted *as applied.*" *Id.* We will discuss those in a later section of the opinion.

Resolving the typical disputes regarding rail crossings is not in the nature of regulation governed by the exclusive jurisdiction of the STB. The relevant question under the ICCTA is whether Franks's railroad crossing dispute invokes laws that have the effect of managing or governing, and not merely incidentally affecting, rail transportation. It does not. Franks brought a possessory action, claiming that it had a servitude of passage similar to an easement over the crossings. This suit is governed by Louisiana property laws and rules of civil procedure that have nothing to do with railroad crossings. Railroads are only affected when the servitude happens to cross a railroad. These property laws are not meant to regulate railroad transportation, though at times they may have an incidental effect on railroad transportation.

The cases on which the district court relied can be viewed as consistent with this interpretation of preemption. The case that may have been most heavily relied on by the district court was from this circuit and involved a state law tort suit against a railroad company for allowing trains to block railroad crossings. *Friberg*, 267 F.3d at 440-41. It is clear that a tort suit that attempts to mandate when trains can use tracks and stop on them is attempting to

manage or govern rail transportation in a direct way, unlike a state law property action regarding railroad crossings. As we noted in *Friberg*, "[r]egulating the time a train can occupy a rail crossing impacts, in such areas as train speed, length and scheduling, the way a railroad operates its trains, with concomitant economic ramifications . . . ." *Id.* at 443. These same concerns are not present in Franks's state law property action.

The district court also cited a Ninth Circuit case involving state and local environmental laws that were impeding the ability of a railroad company to buy, improve, and reopen a railroad track. *City of Auburn v. United States*, 154 F.3d 1025 (9th Cir. 1998). That case also involved an attempt to manage or govern rail transportation, not an incidental effect on rail transportation.

Additionally, the district court relied on an Eighth Circuit opinion involving a city's condemning twenty feet of a one-hundred-foot-wide right-of-way over a length of several city blocks. *City of Lincoln v. Surface Transp. Bd.*, 414 F.3d 858, 858-59 (8th Cir. 2005). The City desired the long stretch of land in order to improve a storm sewer and for a recreational trail. The only issue on appeal, though, concerned the taking of the property for a trail. *Id.* at 863 (the STB did not rule on the use of property as a storm sewer).

After the railroad revealed that it would argue federal preemption if the City sought to condemn the property, the City filed for a declaratory judgment from the STB. The STB ruled, and the Eighth Circuit affirmed, that the City's eminent domain action would "unduly interfere with railroad operations and interstate commerce." *Id.* at 860. To be clear, the dispute in *City of Lincoln* was whether "losing a 20 foot strip from the right of way along four blocks of the line would leave insufficient room for storage, loading, and unloading, as well as access to the track for maintenance and derailment response." *Id.* at 861.

The *Lincoln* opinion is quite relevant. It sustained the STB's application of an as-applied test, as can be seen in this section of the STB's decision:

Based on our review of the record in this proceeding, we find that [the City of] Lincoln has not adequately refuted [the railroad's] contentions that it uses all of its right-of-way, including the northernmost 20 feet, for rail transportation purposes, and that the narrowing of the right-of-way to construct a trail would hinder or halt those legitimate transportation operations and create safety hazards. The burden is on Lincoln to justify its extraordinary request to allow a taking of actively used railroad property. We conclude, based on the record, that Lincoln has not met that burden. Lincoln has not proffered convincing evidence that [the railroad] can satisfy its present and future rail transportation needs using less than the full width of its right-of-way, or that the proposed trail can safely be placed so near [an] active rail line. Because Lincoln has not made such a showing, we cannot declare, as Lincoln requests, that its proposed taking will not unduly interfere with interstate commerce.[3]

After the Eighth Circuit's affirmance, the City continued its plan to condemn the property for a storm sewer, though not as a surface trail. This led to a second declaratory judgment action at the STB and a different outcome.

Courts have held that Federal preemption can shield railroad property from state eminent domain law where the effect of the eminent domain law would have been to prevent or unreasonably interfere with railroad operations. But neither the court cases, nor Board precedent, suggest a blanket rule that any condemnation action against railroad property is impermissible. Rather, routine, non-conflicting uses, such as non-exclusive easements for at-grade road crossings, wire crossings, sewer crossings, etc., are not preempted so long as they would not impede rail operations or pose undue safety risks.

Courts can, and regularly do (sometimes with input from the Board through referral) make determinations as to whether proposed eminent domain actions such as this would interfere with railroad operations. The uses that [the railroad] has raised concerns about here are common and of the type that the courts are well-suited to address. While the Board enjoys broad discretion to institute a declaratory order proceeding to eliminate a controversy

_____

[3] *City of Lincoln – Petition for Declaratory Order,* STB Finance Docket No. 34425, 2004 WL 1802302 (S.T.B. August 11, 2004) (citations omitted).

or remove uncertainty, the particular facts of this case do not suggest that further Board involvement is needed here.[4]

Why the Lincoln storm sewer project was less disruptive than the recreational trail was not explained. Likely the surface use would only be during construction; the storm sewer would be underground; the railroad eventually would reclaim use of its entire surface right of way.

The set of *City of Lincoln* rulings are informative because they highlight relevant distinctions. Substantial interference with railroad operations will be preempted; routine crossing disputes will not. *Barrois*, 533 F.3d at 332-33.

For a state court action to be expressly preempted under the ICCTA, it must seek to regulate the operations of rail transportation. Franks's possessory action invokes only state property laws and is not expressly preempted.

## B.    *Implied Preemption*

Our next question is which test should be used to determine whether Franks's action is impliedly preempted. Franks argues that we should adopt the test used by the STB for such a determination.

The STB's amicus brief to the *en banc* court explained the two-part test it applies to preemption questions. We have already discussed the STB's view about the kinds of state regulation that are expressly preempted. According to its brief, other state law actions "may be preempted as applied—that is, only if they would have the effect of unreasonably burdening or interfering with rail transportation, which involves a fact-bound case-specific determination."

We discover articulations of such a test in STB decisions:

> For state or local actions that are not facially preempted, the section 10501(b) preemption analysis requires a factual assessment of

---

[4] *Lincoln Lumber Co.—Petition for Declaratory Order—Condemnation of a Railroad Right-of-Way for a Storm Sewer*, STB Finance No. 34915, 2007 WL 2299735, *2-3 (STB Aug. 10, 2007) (citations omitted).

whether that action would have the effect of preventing or unreasonably interfering with railroad transportation.[5]

In *Barrois*, we expressed interest in but did not need to endorse or reject the STB's as-applied analysis for railroad crossing disputes. 533 F.3d at 333. We observed that the usual crossing disputes were not "categorically preempted" or "facially preempted" under the STB test but were to be resolved in state court. *Id.* Instead, "within the STB's analytical framework, preemption claims in routine crossing cases fall into the category of *as-applied* preemption challenges." *Id.* We today go further in our review of the STB's test.

Franks and the STB argue that we should give deference to the STB's interpretation of the preemptive effect of the ICCTA and therefore apply the STB's preemption analysis. We acknowledged in *Barrois* that the STB was "the agency authorized by Congress to administer" the ICCTA, making it "uniquely qualified to determine whether state law should be preempted by the" ICCTA. 533 F.3d at 331 (internal quotation marks and citations omitted). However, the Supreme Court has recently reminded us that the reach of preemption is unlikely to be a matter within the expertise of an agency:

> While agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness.

*Wyeth v. Levine*, 129 S. Ct. 1187, 1201 (2009) (internal quotation marks and citations omitted).

---

[5] *CSX Transportation, Inc.-Petition for Declaratory Order,* STB Finance Docket No. 34662, 2005 WL 1024490, at \*2-\*3 (S.T.B. May 3, 2005).

14

Therefore, the STB's decision regarding the preemptive effect of the ICCTA and the test it uses to determine preemption are not binding on us. Still, we are free to adopt the STB's preemption test to the extent that we find it to be reasonable and a persuasive interpretation of the relevant considerations. The STB's test places in ICCTA specifics the general concerns of conflict preemption, those concerns being whether compliance with both state and federal law is impossible. *Friberg*, 267 F.3d at 442. We adopt the STB's as-applied preemption analysis as appropriate for implied preemption under the ICCTA.[6]

Under this fact-based test, state law actions can be preempted as applied if they have the effect of unreasonably burdening or interfering with rail transportation. The district court did not reach the issue of implied preemption because it found Franks's state law claims to be expressly preempted.

Franks makes several arguments regarding why its claim should not be impliedly preempted. Franks's primary argument is that the facts as proven in the district court do not show that these private railroad crossings unreasonably burden or interfere with rail transportation. The Union Pacific argues that the district court made specific findings that private railroad crossings like the ones at issue in this case affect safety, drainage, and maintenance issues and that these factual findings cannot be ignored unless they are clearly erroneous. The Union Pacific maintains that those findings support a conclusion that Franks's private crossings unreasonably burden and interfere with railroad operations.

In this case, the district court conducted a two-day bench trial before finding that Franks's state law claims were expressly preempted. There was

---

[6] Other circuits have utilized in their ICCTA implied preemption analysis the STB's fact-specific approach of determining whether a law or action has the effect of unreasonably interfering with the railroad. *See Island Park*, 559 F.3d at 103-06 (conducting factual inquiry specific to the crossing at issue for preemption analysis, though the court never explicitly states that it is using the STB's as-applied test); *PCS Phosphate Co.*, 559 F.3d at 220-22; *Adrien & Blissfield R.R. Co.*, 550 F.3d at 540-42 (adopting the STB's two-part test in its entirety); *Jackson*, 500 F.3d at 253-54; *Emerson*, 503 F.3d at 1133.

argument and evidence presented regarding how private crossings affect railroad operations. The Union Pacific noted that the crossings at issue were made of wooden planks with approaches made out of dirt and gravel. The tracks were said to be located in a low-lying area prone to flooding, and the land under the tracks was often wet due to its low elevation and the high water table.

Through testimony from some of its employees, the railroad argued that the presence of private crossings can increase the risk of derailment and made track maintenance much more expensive and time consuming. The Union Pacific maintained that the crossings trap water under the track, which degrades the ballast and the crossties. This leads to increased track instability and can cause trains to have to move at a slower speed over affected portions of the track. Additionally, the crossings intersect a portion of the track that can be used as a staging area where trains are held to regulate traffic flow in and out of the nearby terminal.

Franks disputed each of these points. In questioning the Union Pacific's employees, Franks established that there had never been derailments in the area. Further, there was no evidence that trains had needed to slow down during the seventy years that the crossings had been present. Franks also maintained that regardless of whether trains staged there, it just wanted to have access to the crossings when trains were not present. There was also no evidence of the specific crossings at issue causing safety issues.

Franks now argues that all of the evidence relating to railroad crossings introduced at the trial was general and not specific to the four railroad crossings at issue in this case. Therefore, Franks argues that the Union Pacific has not shown that the four crossings at issue unreasonably burden or interfere with railroad operations. The Union Pacific argues that it has shown that private crossings of the type at issue here do burden railroad transportation and that the district court's findings support its position.

The source for the Union Pacific's argument appears to be the district judge's statement during his ruling from the bench that a "crossing is a physical addition to the tracks that allows vehicles to cross the tracks; and that, according to trial testimony, affects safety, drainage, and maintenance issues." We do not see this statement as a fact finding based on the specifics of the four crossings at issue in this case. While the statement includes the language "according to trial testimony," the finding relates to all railroad crossings, not just private ones or the ones at issue in this case.

We conclude that the district court decided only that all railroad crossings affect rail transportation. Certainly at one level that is true. We have held, though, that more is required before preemption applies. This same reasoning undermines the Union Pacific's argument that general testimony regarding railroad crossings satisfies the burden of proving preemption under the as-applied test. The Union Pacific presented testimony that private crossings like the ones at issue here can affect drainage, increase track maintenance costs, and cause trains to move at slower speeds. However, the railroad did not tie any of these specific problems to these four crossings. Though the Union Pacific provided two district court opinions that found preemption based on potential interference with rail transportation, both of those cases involved actions that would have the effect of regulating when a railroad or its facilities could operate.[7] These would be instances to apply express preemption and not as-applied preemption under the STB's test. By definition, an as-applied challenge would need to address specific crossings. Otherwise, a finding of as-applied preemption in this case would be nothing more than a finding that private

---

[7] *See Fayard v. Northeastern Vehicle Servs., LLC*, 490 F. Supp. 2d 134, 141-42 (D. Mass. 2007), *rev'd on other grounds*, 533 F.3d 42 (1st Cir. 2008); *Rushing v. Kan. City Southern Ry. Co.*, 194 F. Supp. 2d 493, 499 (S.D. Miss. 2001).

crossing disputes are always preempted, at least in low-lying areas. We have rejected that view of ICCTA preemption.

There is no evidence in the record to permit a finding that the four crossings created any unusual interference with the railroad. These were typical crossings and a typical dispute. It is not one that is federally preempted.

## III. CONCLUSION

Section 10501(b) of the ICCTA does not expressly preempt Franks's state law action regarding use of its private railroad crossings. No evidence in this record leads to a finding of implied preemption.

We REVERSE the district court's judgment and REMAND for proceedings on the merits of Franks's state law claims.

RHESA HAWKINS BARKSDALE, Circuit Judge, joined by Judges JOLLY and STEWART, dissenting:

Regarding express preemption, while the result reached by the well-written majority opinion may reflect what the ICCTA *should* say, the majority fails to enforce what the ICCTA *does* say. The ICCTA expressly grants the Surface Transportation Board (STB) exclusive jurisdiction over "transportation by rail carriers"; and, such "transportation" includes rail crossings. Understandably, this statutorily-mandated result may be inconvenient, or burden the STB, or even be an undesirable policy choice. That, of course, does not authorize our altering the statute's vesting exclusive jurisdiction in the STB. Accordingly, I must respectfully dissent.

Primarily at issue is whether Congress, through the ICCTA, *expressly* preempted laws such as Louisiana Code of Civil Procedure Article 3655. This analysis, of course, focuses on the language of the preemption clause. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Regarding the STB's exclusive jurisdiction and concomitant preemption, the ICCTA provides:

> The *jurisdiction* of the [Surface Transportation] Board over—
>
> (1) *transportation by rail carriers*, and the *remedies* provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is *exclusive*. Except as otherwise provided in this part, the *remedies* provided under this part with respect to

> *regulation of rail transportation* are *exclusive* and *preempt*
> the *remedies* provided under Federal or State law.

49 U.S.C. § 10501(b) (emphasis added).

Pursuant to this section, the STB has "exclusive" jurisdiction over "transportation by rail carriers", which, as discussed *infra*, includes the rail crossings at issue. This is one of the "remedies" provided by this section for the "regulation of rail transportation", addressed in the above preemption provision. Pursuant to the above section, that remedy is "exclusive and prempt[s] the remedies provided under Federal or State law", including the Louisiana possessory action at issue.

This is the plain meaning of the section. Our court applies the plain meaning of a statute unless doing so would lead to an absurd result. *E.g.*, *Tesfamichael v. Gonzales*, 411 F.3d 169, 173 (5th Cir. 2005). Vesting exclusive jurisdiction in the STB over railroad crossings does *not* lead to such a result. Obviously, for matters of this type, resolution should initially be through the STB, not the courts. Judicial review is available. 28 U.S.C. § 2321 (judicial review of STB orders). Moreover, as discussed *infra*, other sources, including the STB's interpretation of this section, should not be allowed to alter this plain meaning.

The majority takes an approach at odds with this plain meaning. Under the majority's analysis, the questions are: does a rail crossing constitute "transportation by rail carriers"; and, does a state judicial remedy that affects operation of a crossing constitute "regulation of rail transportation"? (Even under this approach, there should be express preemption.)

In the light of the ICCTA's broad definition of "transportation", the district court concluded correctly that a railroad crossing constitutes "transportation by rail carriers". The ICCTA defines "transportation" to include, *inter alia*, "a locomotive, car, vehicle, . . . property, facility,

instrumentality, or *equipment of any kind related to the movement of passengers or property, or both, by rail*, regardless of ownership or an agreement concerning use". 49 U.S.C. § 10102(9)(A) (emphasis added). That a rail crossing falls within this definition is inescapable.

The majority rejects this obvious conclusion but does not explain how a railroad crossing is *not* "equipment of any kind related to the movement of passengers or property, or both, by rail", other than by citation to *Island Park, LLC v. CSX Transp., Inc.*, 559 F.3d 96 (2d Cir. 2009). *See* **Maj. Op.** at 7–8. Yet the Second Circuit admitted (in the very quotation relied upon by the majority): "Rail transportation does include 'property . . . related to the movement of passengers or property . . . by rail,' 49 U.S.C. § 10102(9)(A), and a rail crossing does constitute an improvement to railroad tracks that allows vehicles, equipment, and persons to traverse the tracks". 559 F.3d at 103 (internal quotation omitted); **Maj. Op.** at 7-8.

Although the Second Circuit implicitly recognized that, under the statute's plain language, a rail crossing *does* constitute "transportation by rail carriers", it nonetheless held "the term rail 'transportation' does not encompass . . . this private rail crossing". *Id.* at 103. The Second Circuit reached this conclusion by conflating the question raised by the first sentence of 49 U.S.C. § 10501(b) (what is transportation) with that raised by its second sentence (what is regulation of rail transportation), but then added a factor not found in the section: "what does the state seek to regulate and does the proposed regulation burden rail transportation"? *Id.*

The majority follows suit and, while keeping the two inquiries separate, asks whether the state law at issue *substantially interferes* with railroad operations. **Maj. Op.** at 13. Some might posit that, from a policy perspective, this is desirable. This "substantial interference" approach, however, has no basis in the language of the ICCTA.

Our court's binding precedent in *Friberg v. Kansas City Southern Railway Co.*, 267 F.3d 439 (5th Cir. 2001), is instructive. *Friberg* addressed whether the ICCTA expressly preempted the Texas Anti-Blocking Statute, Tex. Transp. Code. Ann. § 741.007(a). That statute limited, *inter alia*, the length of time a train could occupy a railroad crossing. *Friberg* noted: "Regulating the time a train can occupy a rail crossing impacts, in such areas as train speed, length and scheduling, the way a railroad operates its trains . . . ." *Id.* at 443. Accordingly, our court held the ICCTA expressly preempted Texas' attempt to regulate a railroad's use of railroad crossings. *Id.* at 444.

The majority attempts to distinguish *Friberg* by stating: "These same concerns are not present in Franks's state law property action". **Maj. Op.** at 11. No further explanation is given, however. On the other hand, the district court found such concerns present when it found regulation of the ownership and use of railroad crossings affects safety, drainage, and maintenance, which necessarily affect "rail transportation".

In the absence of preemption, a remedy under Louisiana Code of Civil Procedure Article 3655 could both compel the reinstallation of the destroyed crossings and enjoin the closing of others. In short, this is "regulation of rail transportation", over which the STB has exclusive jurisdiction.

As stated, to circumvent this conclusion, the majority holds the ICCTA preempts state regulation of crossings only if such regulation constitutes a "[s]ubstantial interference with railroad operations". **Maj. Op.** at 13. Again, this approach cannot be justified under the ICCTA's plain language; nor should our court look past that language to other sources, including the STB's flawed analysis.

Finally, because the ICCTA *expressly* preempts Franks' state-law action, I do *not* reach implied preemption *vel non*, except to agree with the majority, of course, that the district court's findings about how crossings affect "rail

22

transportation" related to *all* railroad crossings, not just to those at issue in this action.

I respectfully dissent.